CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2025 OCT -6 A 9:16

September 25, 2025

Honorable Patrick J. Arre, J.S.C.
Superior Court of New Jersey
Law Division – Criminal Part
Veterans Courthouse
50 West Market Street
Newark, New Jersey 07102

Re: State of New Jersey v. Moshe Glick
Indictment No. 25-07-01562-I

Dear Judge Arre:

I represent Dr. Moshe Glick in connection with the above-referenced matter. Kindly accept this letter brief in lieu of a more formal brief in support of Dr. Glick's Motion to dismiss the Indictment based on prosecutorial misconduct in the presentment.

**BACKGROUND**

Dr. Moshe Glick is a long-time resident of West Orange, New Jersey where he resides with his wife, Renee, and raised three children. He is a dentist with his own practice located in the Bronx, New York. Rivaling the dedication he has for his work, Dr. Glick

**EXHIBIT A**

also dedicates himself to volunteer work in his greater Essex County community. Among other things, he serves as a volunteer Emergency Medical Technician (EMT) and was a co-founder of the West Orange/Livingston Volunteer Helpers, which provides services, including meals and visits, to the homebound elderly and ill. Dr. Glick is a board member of his synagogue, Congregation Ohr Torah, located at 270 Pleasant Valley Way, West Orange, New Jersey.

Dr. Glick accommodated a request to host a seminar on buying apartments in the State of Israel at his home in West Orange on November 13, 2025. After the scheduling of the event, Dr. Glick learned that a similar event held in Bergenfield, New Jersey was met with violent protests. Dr. Glick's concerns about such violent protests occurring at his home was heightened when a known anti-Israel agitator appeared at his home taking pictures and leaving a document containing threats. Dr. Glick had the West Orange Police Department informed of this information, and a decision was made to relocate the event to the Ohr Torah Synagogue. The event at both locations was to include a celebration of the Jewish religion and Jewish culture. Certain of the religious and cultural aspects of the event were held outdoors in front of the synagogue.

Dr. Glick's fears proved well founded. A large group of aggressive anti-Israel protestors descended on the synagogue. The West Orange Police Department allowed the protestors to stand on synagogue property and penetrate the Jewish religious and cultural event that was being held outside the synagogue. This had the effect of blocking access to the synagogue for members of the Jewish community. Video recordings show the protestors

intimidating and harassing members of the Jewish community who had assembled outside the synagogue by, among other things, directing the epitaph "Nazis" toward them and blowing large air horns dangerously close to their ears.

Dr. Glick was one of the members of the Jewish community assembled outside the synagogue. He saw an individual, later identified as one Altaf Sharif, forcibly place his forearm around a masked individual's neck and throat and tackle him to the ground while maintaining the chokehold. This masked individual was later identified as one David Silberberg. Mr. Sharif began dragging Mr. Silberberg down a hill while still holding one of the large air horns he had been blowing. Mr. Sharif was significantly larger and obviously stronger than Mr. Silberberg. As a health care professional and a trained EMT, Dr. Glick immediately feared that Mr. Silberberg was in real danger of serious bodily injury or even death. As documented by video recordings, Dr. Glick called out repeatedly for the police who were in the vicinity of the synagogue: "POLICE" "POLICE" "POLICE." Unfortunately, there was no police response.

Dr. Glick saw Mr. Sharif still having life threatening control over Mr. Silberberg at the bottom of the hill. Mr. Sharif was standing over Mr. Silberberg who was forcibly bent over facing Mr. Sharif. Mr. Sharif had his arms around Mr. Silberberg's upper body including at times his neck. Dr. Glick cried out for the police again. Again, there was no police response. Even though Dr. Glick was holding a small 6" flashlight that he had been using to illuminate the outdoor nighttime events at the synagogue, he chose to use

only minimal force to try and save Mr. Silberberg. At that point, Mr. Silberberg had been under Mr. Sharif's dominance continuously for quite some time and a cause for concern to Dr. Glick as a health care professional and EMT was that Mr. Silberberg was not making any sounds. Dr. Glick ran up to Mr. Sharif and with each of his hands, including the hand holding the flashlight, pushed on each of Mr. Sharif's shoulders in attempting to get Mr. Sharif to release his dangerous grip on Mr. Silberberg. Dr. Glick did not use the flashlight. Unfortunately, due to Mr. Sharif's size and strength, Dr. Glick's action was to no avail, and Mr. Sharif continued his potentially deadly grip on Mr. Silberberg.

Mr. Sharif then, still dominating Mr. Silberberg, forced Mr. Silberberg onto the pavement of the synagogue next to a trailered boat that had sharp projections. There were several unidentified people around and close to Mr. Sharif and Mr. Silberberg, and this group was in constant motion. Mr. Sharif was still standing over Mr. Silberberg who was forcibly bent over facing Mr. Sharif. Mr. Sharif still had his arms around Mr. Silberberg's upper body including at times his neck. Mr. Silberberg was still not uttering a sound. As a health care professional and EMT, the continued silence on Mr. Silberberg's part may in fact have been a sign of an obstructed airway. When Dr. Glick then saw Mr. Silberberg's legs buckle, he believed Mr. Silberberg was losing consciousness and could die right there by the synagogue. At that point, Dr. Glick decided to act - not out of hatred - but to save Mr. Silberberg's life. Having called for the police twice to no avail, having tried to push Mr. Sharif into releasing his grasp on Mr. Silberberg to no avail, something more was needed to prevent a disaster. Having

exhausted these lesser options, and then calling out for the police once more, Dr. Glick decided to use his 6-inch flashlight to lightly strike Mr. Sharif once on the back to get him to release his potentially deadly grip on Mr. Silberberg. Unfortunately, due to the movement of the throng of individuals, Dr. Glick's flashlight ended up striking Mr. Sharif on the head. However, Mr. Silberberg was finally freed. The police finally arrived and intervened. Dr. Glick later learned that the man he had saved was the 64-year-old Mr. Silberberg who had pepper sprayed Mr. Sharif in the right eye. Dr. Glick did not see this pepper spraying and only became engaged when he saw Mr. Sharif forcibly place his forearm around Mr. Silberberg's neck and throat and tackle him to the ground while maintaining the chokehold Afterward, Dr. Glick saw Mr. Sharif, who looked unphased, return to the protest and learned later that he even had initially refused medical attention.

## PROCEDURAL HISTORY

On or about January 14, 2025, Dr. Glick was charged in Complaint No. 0722-S-2025-000014 with a violation of N.J.S.A. 2C:16-1a(1) (Bias Intimidation) a crime of the second degree; a violation of N.J.S.A. 2C:12-1b(7) (Aggravated Assault) a crime of the third degree; a violation of N.J.S.A. 2C:39-4d (Possession of Weapon for Unlawful Purpose) a crime of the third degree; and a violation of N.J.S.A. 2C:39-5d (Unlawful Possession of Weapon) a crime of the fourth degree. On or about January 27, 2025, Dr.

Glick appeared with counsel at the West Orange Police Department to submit to identification procedures in connection with the Complaint Summons.

Counsel filed his Notice of Appearance with the Court on January 30, 2025. Counsel filed the Waiver of First Appearance on the Complaint Summons with the Court on February 25, 2025. Thereafter, counsel met with Assistant Prosecutor Logan Teisch to discuss the matter. Mr. Teisch provided counsel with a copy of discovery in furtherance of the State's obligation under R. 3:13-3(a) as a result of the State having conveyed an offer. While counsel's position is that the discovery provided was deficient and corresponded with Mr. Teisch about the deficiencies without resolution, this brief only covers Dr. Glick's motion to dismiss the indictment. Counsel thereafter met with Mr. Teisch to present reciprocal discovery consisting of video recordings capturing the events at issue in the case and then participated in a meeting with Mr. Teisch and supervisory members of the Essex County Prosecutor's Office to request that the charges against Dr. Glick be dismissed. As a result of these efforts, the Essex County Prosecutor's agreed to dismiss the alleged violation of N.J.S.A. 2C:16-1a(1) (Bias Intimidation) a crime of the second degree. In a May 28, 2025, email, Mr. Teisch informed counsel that "after careful consideration of the evidence again, in conjunction with your presentation, my office and I have agreed to dismiss the one count of Bias Intimidation against your client."

Counsel had sent an April 21, 2025, letter to Celeste M. Montesino, Deputy Chief Assistant Prosecutor, "demand[ing] that the Essex County Grand Jury be given access to

evidence in the defense's possession that "directly negates guilt . . . and is clearly exculpatory" citing State v. Hogan, 144 N.J. 216, 237 (1996). An agreement was reached with the State that the two entire unedited videos obtained by the defense from which an approximate 5-minute defense video presentation to the Essex County Prosecutor's Office was constructed (surveillance video from the Ohr Torah Synagogue and video of events made by a member of the Jewish community) would be played for the Grand Jury. The State would not agree to play for the Grand Jury the portions of Mr. Sharif's written and videotaped statements that are directly contradicted by the defense videos and would not agree to submit to the Grand Jury other evidence supportive of Dr. Glick's innocence.

Counsel and the State engaged in discussions concerning Dr. Glick's request to testify before the Grand Jury. Having reached agreement on the terms of Dr. Glick's appearance before the Grand Jury, Dr. Glick testified before it on June 25, 2025.

The State presented its cases against Dr. Glick and Mr. Silberberg at the same time. Indictment No.

25-07-01562-I was returned against Dr. Glick and Mr. Silberberg on July 3, 2025. Count Five of

the Indictment charges Dr. Glick with a violation of N.J.S.A. 2C:12-1b(7) (Aggravated Assault) a

crime of the third degree. Count Six of the Indictment charges a violation of N.J.S.A. 2C:39-4d

(Possession of Weapon for Unlawful Purpose) a crime of the third degree. Count Seven

of the Indictment charges a violation of N.J.S.A. 2C:39-5d (Unlawful Possession of Weapon) a crime of the fourth degree.

Dr. Glick appeared before Judge Kahn on August 1, 2025, for arraignment. An Arraignment Order was entered on that same date. The Order noted the defense's position that there was outstanding discovery due from the State. The Order memorialized the State's position on Dr. Glick's application for admission to the Pretrial Intervention Program (PTI), which the State had placed on the record at the arraignment: The State agreed to his admission without a plea of guilty for a one year term. Dr. Glick would be able to move for early completion of PTI after six months in the program without objection from the State assuming no violations of program requirements.

Counsel noted that a motion to dismiss the Indictment would be filed. The State agreed to hold open its PTI position through the conclusion of this motion practice. Judge Kahn set September 15, 2025, as the due date for the filing of the defense's brief in support of the motion. Judge Kahn scheduled a status conference for that same date at which time the rest of the briefing

schedule and

the return date of the motion would be set. With the consent of the State, defense requested and

obtained an adjournment of the status conference date and due date for its brief in support of the

motion to September 25, 2025.

**FACTS**

Attached is a copy of the Grand Jury Transcripts pertaining to issues raised by this motion: 1) Transcript of the June 25, 2025, presentment to the Essex County Grand Jury pertaining to Dr. Glick and Mr. Silberberg; 2) Transcript of the March 12, 2025, Preliminary Instructions to the Essex County Grand Jury (partial); and 3) Transcript of the March 12, 2025, Preliminary Instructions to the Essex County Grand Jury (partial).

I will highlight in this section those portions of the transcripts that are fundamental to the legal arguments set forth in the next section of this letter brief. During the course of the legal argument I may refer to other portions of the transcripts that bear on the legal arguments as well.

**EXCERPT 1: Page 5, Lines 2 through 13 (June 25, 2025, Transcript):**

> [MR. TEISCH] That is the law as to bias intimidation. Does anyone have any questions regarding bias intimidation, or the aggravated assault or weapons charges that I previously mentioned?

A. Yes.

Q. Still – what appears to be staring in the direction of Mr. Sharif, correct?

A. Yeah. Again, I'll tell you that I did not see that. I'm looking – it appears to me from the film that Mr. Silberberg comes from the side. I'm kind of looking at the other side, so I did not see that. And it's kind of moving up the hill there.

Q. Are you saying that at this point in time you're not looking at Mr. Sharif?

A. I am looking at Mr. Sharif, but I can't see – not that side of him.

Q. Can you see Mr. Sharif closing his eyes? Did you at that point in time on that evening see Mr. Sharif closing his eyes?

A. I didn't see that.

Q. Did you see his eyes stay open while you're interacting with him?

A. I did not. Nope.

Q. Resuming at 26 Seconds. Stopped at 27 seconds. Now, Mr. Glick, it does appear you're still facing in the direction of Mr. Sharif, correct?

A. No. It – can I come closer?

Q. Sure.

MR. TEISCH: Okay. And just for the record, Juror 17 did indicate that she has familiarity with this case, and prior knowledge of the case, and intimate knowledge of the facts and circumstances of the case. And for that reason she will not be participating in this presentation, and not participating in the deliberations for this particular case.

Given that has anyone else, other than Juror 17 who has already been excused from the room, have any familiarity of prior knowledge of the case? Okay.

These excerpts, Nos. 1 and 2, discussed more fully in the Legal Discussion section to follow, unequivocally demonstrate a violation of the mandate of State v. Murphy, 110 N.J. 20 (1988) and its progeny by the Assistant Prosecutor's failure to bring to the Assignment Judge for decision the question of Grand Juror bias thus requiring a dismissal of the Indictment.

**EXCERPT 3: Page 48, Line 1 (June 25, 2025)**

Q. [] Mr. Glick, you can see here based on the video that Mr. Sharif has pepper spray being sprayed into his eyes, is that fair to say?

A. Yes.

Q. Now did you see this happening in real time?

A. No.

Q. You're standing here on the right-hand side of the screen, correct?

JUROR: Yes.

MR. TEISCH: Yes

JUROR: I know about this case very well. So

--

MR: TEISCH: Okay. I was just going to –

JUROR: I know the defendant.

MR. TEISCH: I was just going to get to that in a moment. All right.

**EXCERPT 2: Page 7, Lines 2 through 20 (June 25, 2025):**

Now, ma'am, you mentioned that –

JUROR: Yeah.

MR. TEISCH: -- you do have familiar –

JUROR: I can remain partial, but I do know of the incident.

THE CLERK: We're going off the record.

(Off the records at 11:39:02 a.m.)

(Back on the records at 11:41:32)

A. Yeah. There were lots of other people kind of behind here. And once there was – the total I don't know. There was you know a lot of activity going on. I was not looking in this direction. There were more people that – if you can see my eyes, I'm looking that way toward it. So if your question is did I see that. No. The answer is no.

Q. So, you're not – at this point in time on this particular evening you're not seeing Mr. Sharif closing his eyes and putting his hand over his eyes as if he were just pepper sprayed?

A. Correct.

Q. It does appear that there's only a few feet between the two of you, correct?

A. Correct.

Q. Based off of the video here. You see that Mr. Sharif, and the individual in front of him, directly in your line of sight it does appear are all illuminated, correct?

A. Yeah, there's some illumination. Not only from my flashlight, but there is illumination.

Q. Okay, You're indicating that there were other individuals who had flashlights that evening?

A. Lots of people, including law enforcement.

Q. And that it could have been them who were lighting up Ms. Sharif and this individual, not necessarily you?

A. Possibly.

Q. Resuming at 27 seconds.

A. Can you stop it there for a second? I could tell it's my (indiscernible).

Q. That's okay.

A. I don't need to --

Q. Well, we'll stop here at 28 seconds.

A. Yeah. Just to drop that. You – again, just kind of the idea of where I'm looking I see – I'm more looking up the street. This where the protestors are coming. They're saying some real nasty – nasty you know hate speech. So, I was really – my attention was more directed up there.

Q. Okay. And your testimony is that you're not witnessing anything that's happening with Sharif and Silberberg over on the left-hand side?

A. That's correct. I'm also screened by this – somebody here.

Q. Correct. Yes. At this point in time –

A. I'm blocked out as well.

Q. Correct. Yes. At this point at 28 seconds we really can't see you? You're blocked out --

A. Yeah. And some of the other parts earlier.

Q. Resuming now at 28 seconds. Now I'm going to stop it

here. This is at 33 seconds. Mr. Glick, is it fair to say that's you're flashlight here?

A. Probably. Yup.

Q. All right. So that's your hand holding a flashlight in the direction of Mr. Sharif?

A. Probably yeah. It looks like my hand.

Q. So at this point your attention diverted back to Mr. Sharif?

A. I can't say where my attention was, but my flashlight – clearly I knew there was something going on, and I just thought to illuminate there. It's pretty dark up there. There were some other flashlights (indiscernible).

Q. So is it fair to say at this point there was something going on to your left that attracted your attention?

A. Probably, yeah.

Q. But you didn't see the pepper spray, or Mr. Sharif try to I guess regain his visibility?

A. I did not.

**<u>EXCERPT 4: Page 87, Line 7 to Page 88, Line 3 (June 26, 2025 Transcript)</u>**

MR. TEISCH: And, Mr. Glick, just to clarify one more time, none of the protestors, the Pro-Palestinian protestors, were being violent until Mr. Silberberg came along and pepper sprayed Mr. Sharif, correct?

THE WITNESS: No. There was just lots of hate speech.

MR. TEISCH: But no one had assaulted anybody, nobody put their hands on anybody as far as you –

THE WITNESS: Not to my knowledge.

MR. TEISCH: And, again, you did not see Sharif being pepper sprayed, even though you had just been looking at him directly in the eyes, and going back and forth verbally with him, 1, 2, maybe two-and-a-half seconds earlier?

THE WITNESS: Yeah. I've answered that question. (Indiscernible). I said there was somebody blocking me. And the people were coming this way, so my eyes were more looking up the street. But, as I said, I didn't see it. I'm not sure that it would have mattered if I saw it or not. But, I did not see that.

These excerpts, Nos. 3 and 4, discussed more fully in the Legal Discussion section to follow, demonstrate unequivocally the Assistant Prosecutor's misapprehension of the law related to Dr. Glick's use of force in protection of Mr. Silberberg – Dr. Glick had the right to use force to protect Mr. Silberberg notwithstanding the fact that Mr. Silberberg was the initial aggressor the only qualifications being Dr. Glick's subjective intent, that he reasonably arrived at the conclusion that Mr. Silberberg was in peril, and that the force he used was necessary. State v. Holmes, 208 N.J.Super. 480, 487 (1986). This misapprehension of the law infected the Grand Jury proceeding with prejudicial error mandating dismissal of the Indictment.

**EXCERPT 5: Page 89, Line 9 to Page 93, Line 16 (June 25, 2025, Transcript)**

> And given Mr. Glick's testimony here today, I want to read you the law as to the use of force in protection of others. Justification placed [so in original – should probably read "based"] on 2C:3-5. The use of force upon or towards a person of another is justifiable to protect a third person when that actor would justified in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect.
>
> And under the circumstances as the actor reasonably believes them to be, the person whom he seeks to protect would be justified in using such protective force. And the actor reasonably believes that his intervention is necessary for the protection of such other person.
>
> You must first determine whether the force used by Mr. Glick to protect Silberberg, the third person, would have been justified if Glick had used such force to protect himself. Under the guidelines of the law pertaining to self-defense under 2C:3-4. 2C:3-4 states that the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> In other words, self-defense is the right of a person to defend against any unlawful force. Self-defense is also the right of a person to defend against seriously threatened unlawful force that is actually pending or reasonably anticipated.
>
> When a person is in imminent danger of bodily harm, the person has the right to use force, or even deadly force, when that force is necessary to prevent the use against him of unlawful force.
>
> The force used by the defendant must not be significantly greater than, and must be proportionate to the unlawful force threatened or used against him. Unlawful force is defined as force used against the person, without that person's consent, in such a way that the action would be a

civil wrong or a criminal defense. Sorry, a criminal offense.

If the force used by the defendant was not immediately necessary for the defendant's protection, or if the force used by the defendant was disproportionate in its intensity, then the use of such force by the defendant was not justified, and the self-defense claim fails.

A person may use non-deadly force in his own defense. If you find that the defendant did use non-deadly force, then you must determine whether that force was justified.

A person must – may use non-deadly force to protect himself if the following conditions exist. The person reasonably believes that he must use force, the person reasonably believes that the use of force was immediate and necessary, and the person reasonably believes that he's using force to defend himself against unlawful force, and the person reasonably believes that the level of the intensity of the force he uses is proportionate to the unlawful force he is attempting to defend against.

A reasonable belief is one which would be held by a person of ordinary prudence and intelligence situated as this defendant was. Self-defense exonerates a person who uses force in the reasonable belief that such action was necessary to prevent his injury from another's use of unlawful force against him, even though his belief was later proven mistaken.

Accordingly, the law requires only a reasonable, not necessarily incorrect [so in original – should probably read "correct"] judgment. Remember, only if you conclude that in using force the defendant reasonably believed that he was defending against unlawful force is the defense available to them. Now that's the law as to self-defense. Going back to defense of another.

So, the first thing you had to determine - - have to determine whether the force used by Glick to protect Silberberg would have been justified if Glick had used the force to protect himself.

Second, you must determine whether Glick reasonably believed

that the person whom he sought to protect, in this case Silberberg, would have been justified in using such force in his own self-defense.

In applying this test you are instructed to disregard any finding that the person in who's behalf Glick intervened was in fact the aggressor, or that no defensive measures on his behalf were actually necessary.

But, you may consider everything Glick knew when he acted, including these same factors, i.e., that he knew Silberberg was the aggressor, or that no defensive measures on his behalf were actually necessary if you find that Glick actually knew those things.

Finally, you must determine whether Glick acted reasonably. I'm sorry. You must determine whether Glick reasonably believed that these actions were necessary to protect Silberberg.

That's all the law as to this case. So that's the law as to the justification defense for use of force and protection of others. That's the laws as to self-defense. I read the law previously as to bias intimidation, and you previously had been read the law as to the weapons offenses and aggravated assault.

Given all of that anybody have questions regarding the law. I see one hand. Yeah. Two hands.

JUROR: Can you just read bias intimidation again?

MR. TEISCH: Yes. Under 2C:16-1(a)(1), a person is guilty of the crime of bias intimidation if he commits, attempts to commit, conspires with another to commit, or threatens the immediate commission of an offense specified for purposed of this case in N.J.S.A. 2C:12-1, which aggravated assault or simple assault, with the purpose to intimidate an individual or group of individuals because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin or ethnicity.

Bias intimidation is a crime one degree higher than the most

> serious underlying crime. So, if the assault in this case were a third-degree, the bias charge would be second-degree.
>
> Also proof that the target of underlying offense was selected by the defendant, or by another acting in concert with the defendant because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin or ethnicity shall give rise to a permissive inference by the trier of fact, that would be you, that the defendant acted with a purpose to intimidate an individual or group of individuals because of those characteristics. Race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin or ethnicity.

This excerpt, No. 5, discussed more fully in the Legal Discussion section to follow, likewise demonstrates the Assistant Prosecutor's misapprehension of the law related to Dr. Glick's use of force in protection of Mr. Silberberg. Additionally, and significantly, the Assistant Prosecutor's charge on the law on bias intimidation directly following his charge on the law on defense of others without any cautionary instruction as to the limitation of use of the bias intimidation charge to Mr. Silberberg only had a strong tendency to cause confusion of the Grand Jurors thereby infecting the proceeding with prejudicial error warranting dismissal of the Indictment.

**EXCERPT 6 – Page 10, Line 9 to Line 13 (March 12, 2025, Transcript)**

> Under B.7 [of N.J.S.A. 2C:12-1b(7)(Aggravated Assault)] attempts to cause significant bodily injury to another or causes significant bodily injury purposely, knowingly, or under circumstances manifesting extreme indifference to the value of human life, recklessly causes significant bodily injury.

**EXCERPT 7 – Page 3, Line 4 to Line 7 (March 12, 2025, Transcript)**

> [Significant bodily injury] means bodily injury in which – which creates a temporary loss of the function of any bodily member or organ or temporary loss of any one of the five senses.

**<u>EXCERPT 8 – Page 3, Line 15 to Line 21 (March 12, 2025, Transcript)</u>**

> Criminal attempt. A person is guilty of an attempt to commit a crime if acting with the kind of culpability otherwise required for the commission of the crime he engages in conduct which would constitute the crime if the attendant circumstances were as a reasonable person would believe them to be.

These excerpts, Nos. 6 through 8, discussed more fully in the Legal Discussion section to follow, demonstrate a significant time lag from when they were given as part of the preliminary instructions to the Grand Jury to the date of the actual presentment against Dr. Glick.

**<u>EXCERPT 9 – Page 32, Line 24 to Page 33, Line 7 (June 25, 2025, Transcript)</u>**

> Q. Now Detective . . . [b]ased on your knowledge, and your review of the facts and circumstances of this case, is your understanding that Mr. Shaif did ultimately have to go to the hospital for his injury, correct?
>
> A. Yes.
>
> Q. And that when he went to the hospital he did receive four staples to close the wound to his head?
>
> A. Yes.

Excerpts 6 through 9, as discussed more fully in the Legal Discussion section to follow, while including accurate charges regarding the law demonstrate that the presentment was completely bereft of any proof that Mr. Sharif sustained "a temporary loss of the function of any bodily member or organ or temporary loss of any of the five senses," a *sine qua non* under N.J.S.A. 2C:12-1b(7)(Aggravated Assault). The subject matter of the Grand Jury proceeding being an allegation of a completed crime and not an attempt, Count 5 of the Indictment lacks probable cause in support of it and accordingly must be dismissed.

**EXCERPT 10 – Page 14, Lines 6 through 9 (June 25, 2025, Transcript)**

> On the lefthand of the screen here you see an individual here blowing a horn wearing a Palestinian Kufiya, correct?
>
> A. Correct. [By Det. Seymour].

**EXCERPT 11 – Page 14, Lines 21 through 25 to Page 15, Lines 1 through Line 15 (June 25, 2025, Transcript)**

> [T]o the left side of him [Dr. Glick] there's another individual who also appears to be wearing an indication of a Palestinian Kufiya on the right shoulder of that other individual, correct?
>
> A. Correct. [By Det. Seymour].
>
> Q. And again we're still seeing this image, the victim Altaf Sharif blowing his horn in the direction of Mr. Glick. Is that right?
>
> A. Yes.

Q. I'm going to just step back one second on S-4. Starting again at 16 seconds. It's still frozen here. You see a bug where Mr. Glick is. Right in the middle of the screen here you see his – an arm raised above his head?

A. Yes

Q. And here at that point there appears to be an object in his hand?

A. Yes.

Q. And that object is a flashlight, correct?

A. Correct.

**EXCERPT 12 – Page 31, Lines 17 through 20 (June 25, 2025, Transcript)**

Q. In the center of the screen here wearing a Palestinian Kufiya, we see our victim Altaf Sharif, correct?

A. Yes.

Excerpt Nos. 10 through 12, as discussed more fully in the Legal Discussion section to follow, demonstrate a focus on a fact scattered throughout the presentment only relevant to the charge of Bias Intimidation against Mr. Silberberg, that Mr. Sharif was wearing a Palestinian Kufiya, yet allowed to be testified to without limitation by the Assistant

Prosecutor thereby prejudicing Dr. Glick.

**EXCERPT 13 – Page 76, Lines 3 through 11 (June 25, 2025, Transcript)**

> THE WITNESS [DR. GLICK]: I did remember seeing Mr. Sharif rejoin the protest. He went back to his horn, so didn't say, oh my God, my head is bleeding. None of that stuff. And I think that shows on the video he rejoins the – he rejoins the protest, he's blowing his horn for a while. And again, I'm not sure which police video – which body cam footage it showed or not, but he does initially refuse medical attention. It's not until much later on in the evening that he does.

**EXCERPT 14 – Page 75, Lines 10 through 12 (June 25, 2025, Transcript)**

> Mr. Sharif himself didn't know that he was hit in the head until much later on.

Excerpts No. 13 and 14 support, as discussed more fully in the Legal Discussion section to follow, support the fact that there was a complete absence of any proof submitted to the Grand Jury that Mr. Sharif had suffered Significant Bodily Injury as required by N.J.S.A. 2C:12-1b(7) (Aggravated Assault), one of the statutes under which he was charged.

## POINT ONE

## THE INDICTMENT MUST BE DISMISSED DUE TO THE FAILURE OF THE ASSISTANT PROSECUTOR TO BRING POTENTIAL GRAND JUROR BIAS TO THE ASSIGNMENT JUDGE FOR DECISION

At the beginning of the Grand Jury's consideration of Dr. Glick's matter, after the Assistant Prosecutor had provided the Grand Jury with the names of the defendants and was about to complete his charge on some of the law pertaining to the case, a Grand Juror interrupted with the following: "I know about this case very well[,]" and "I know the defendant." When the Assistant Prosecutor got back to her, the Grand Juror stated: "I can remain partial, but I do know of the incident." A reasonable read of what the Grand Juror was actually saying was, "I can remain impartial, but I do know of the incident." In any event, the Assistant Prosecutor then made the first of two errors in connection with this Grand Juror. He decided to go off the record and have a colloquy with the Grand Juror thereby depriving the Courts of the opportunity for meaningful review of a basis for the Assistant Prosecutor's decision to excuse the Grand Jury. See N.J.S.A. 2B:21-8 ("The testimony of witnesses, comments by the prosecuting attorney, and colloquy between the prosecuting attorney and witnesses or members of the grand jury shall be recorded

stenographically or electronically").

The Assistant Prosecutor's second error is fatal to the Indictment. He took It upon himself to be the arbiter of whether or not the Grand Juror was to be excused for bias when he was mandated by the Supreme Court and its progeny to refer issues of Grand Juror bias to the Assignment Judge for consideration and decision. State of New Jersey v. Murphy, 110 N.J. 20 (1988).

The Murphy Court was faced with a case presented by Deputy Attorneys General to the State Grand Jury. I note that the decision made no distinction between a State Grand Jury and a County Grand Jury when it came to the bright line procedure and the consequences for violation thereof that the Court created. Despite the DAGs having received information pertaining to potential Grand Juror bias, the DAGs did not bring to the attention of a court "the qualifications of these individual jurors with respect to their ability to serve without bias or prejudice." Id. at 33. Defendant moved to dismiss the Indictment based on Grand Juror bias. The Assignment Judge's decision not to dismiss the Indictment was upheld by the Supreme Court:

> We are satisfied that in this case the assignment judge who entertained the motion to dismiss the indictment carefully weighed the evidence concerning the bias or prejudice of the State Farm juror and the possible consequences of the improper procedures, including any damaging discussions between the remaining grand jurors and the Allstate grand juror. The assignment judge had to resolve whether the somewhat conflicting answers of the State Farm grand juror demonstrated the receipt of information or the possession of attitudes that would conflict with the juror's ability to evaluate fairly the evidence against the defendant. It is a

> question on which minds may reasonably disagree, but we ordinarily defer to a trial court's fact-finding unless it was based on inadequate evidence, incorrect principles of law, or unless there was a clear mistake in judgment. [Citation omitted].
>
> We are satisfied that the court fairly resolved that the presence of the State Farm grand juror did not "substantially undermine" the objectivity of the charging process or cause harm to the defendant.

Id. at 34-35. Although severely criticizing the conduct of the DAGs ("the DAGs in this case demonstrated extraordinarily poor judgment"), Id. at 36, the Supreme Court felt constrained from dismissing the Indictment based on a violation of the Attorney General's Grand Jury Manual and a Court Rule due to "the lack of clear direction in the Attorney General's *Grand Jury Manual* and the absence of any directly applicable court Rule" and the DAGs' conduct "was not a willful and deliberate violation of established procedures." Id. at 36. That was not the end of the matter, however. The Supreme Court went on to rectify that lacuna and establish a bright-line rule mandating dismissal of an indictment in the event potential bias on the part of a Grand Juror is not brought to the attention of the court – no longer would there be a case by case analysis as to whether "the receipt of information or the possession of attitudes [by a Grand Juror] conflict with the juror's ability to evaluate fairly the evidence against the defendant." Id. at 35.

As the Supreme Court ruled:

> [T]he Deputy Attorneys General assigned to the grand jury undertook to resolve these questions [of bias] on their own. This should never happen again. We believe that a prosecuting attorney has the obligation not only to note the existence of possible prejudice or bias on the part of a grand juror but to disclose such circumstances to the court and to afford the court

> the opportunity to preserve the impartiality of the grand jury proceedings. Accordingly, we now hold that, as an officer of the court, the prosecuting attorney has a responsibility to bring to the attention of the presiding judge any evidence of partiality or bias that could affect the impartial deliberations of a grand juror [Citation omitted]. We hold further that upon such a disclosure the court should determine whether such partiality or bias exists and whether it justifies excusal of the grand juror from the particular case being considered or from the panel.

Id. at 33.

The Supreme Court repeatedly underscored the consequences of a deviation from its new bright-line rule:

> [I]n the exercise of our supervisory jurisdiction over criminal procedure, however, we shall require that any future deviation from the procedures outlined in this opinion will lead to the dismissal of any resulting indictment.

Id. at 23.

> In the future, however, we shall require that violation of such procedures by a prosecuting attorney, in the face of evidence of grand juror bias or partiality, will result in dismissal of an indictment prior to trial.

The Assistant Prosecutor's conduct in the instant case tracked that of the DAGs in the case before the Supreme Court whose conduct it had so severely criticized, and, as a result of which, the Court had created its bright-line rule.

The Supreme Court referred the issue of potential Grand Juror bias to its Criminal Practice Committee. Id. at 36. The result of that referral was an amended R. 3:6-3 by the

addition of a Paragraph (a) as follows:

> Potential Bias. When appropriate, the Assignment Judge shall inquire of potential grand jurors about such aspects of their background as may reveal possible bias or interest in a matter to come before the grand jury. The Assignment Judge shall instruct the grand jury that without the Assignment Judge's approval no grand juror shall participate in any matter in which that juror has a bias or a financial, proprietary, or personal interest; and if that juror wishes to participate, the juror shall forthwith so inform the prosecutor. The prosecutor shall forthwith inform the Assignment Judge, who shall determine, in camera, whether such bias or interest exists and whether it justifies excusal.

The facts of the Instant case are on all fours with the dictates of this Rule. The Grand Juror wished to participate, the Grand Juror informed the Assistant Prosecutor, the Assignment Prosecutor failed to inform the Assignment Judge who then was deprived of his role in determining whether bias existed and whether it justified the excusal of the Grand Juror.

See also State v. Land, 376 N.J.Super. 289, 292-293 (App. Div. 2005) ("The procedure utilized here through the questioning of the potential grand jurors by the DAG and presenting the information to the designated judge was in compliance with R. 3:6-3(a)"); State v. Schenkolewski, 301 N.J.Super. 115, 150 (App. Div. 1997)("Since both the mandate of Murphy and the requirement of R. 3:6-3 were violated, the judge properly dismissed the indictment").

The Appellate Division decision in State v. Murphy, 213 N.J.Super. 404, 411-412 (1986),

> have the potential for bias or interest. Once a grand juror makes known a basis for questioning his or her ability to proceed due to bias, financial, proprietary or personal interest, the prosecutor must explore whether the situation has the potential for warranting excusal and determine the juror's position on the issue. If the circumstances appear sufficient to raise a reasonable inference of bias or interest, that minimal threshold is met and the prosecutor must refer the matter to the Assignment Judge for determination.

And see State v. Hogan, 336 N.J.Super. 319, 350 (App. Div. 2001)(quoting with approval the "legitimate and colorable basis" standard from the Appellate Division's decision in Murphy).

In any event, it is not necessary to attempt to reconcile the "any evidence" standard of the Supreme Court in Murphy with the prior or subsequent Appellate Division decisions because it is beyond cavil that the Grand Juror statements in the instant matter that she "knows the defendant" and "knows of the incident" supported both "a legitimate and colorable belief that a juror may be prejudiced" and raised "a reasonable inference of bias or interest" on the part of that Grand Juror thus mandating the submission of the issue to Assignment Judge.

The Assistant Prosecutor did not submit the Issue of the Grand Juror's potential bias to the Assignment Judge for decision when required to do so thus violating the Murphy bright-line procedure and R. 3:6-3(a) with the consequence that the Indictment must be dismissed *in toto*.

which was affirmed by the Supreme Court as discussed above presaged the bright-line rule announced by the Supreme Court:

> [W]e are of the view that whenever there is a legitimate and colorable issue as to the propriety of a grand juror remaining on the penal because of possible prejudice, the prosecutor may not simply decide to permit that juror to continue to serve in the case. It is incumbent upon the prosecutor to advise the assignment judge of the problem so that appropriate action can be taken. Under such circumstances, the assignment judge is to determine whether the juror remains on the case. . . . We do not suggest that that every question as to whether a grand juror shall absent himself from a particular session requires the intervention of the assignment judge. [Citation omitted]. We merely hold that where the prosecutor is made aware of facts which support a legitimate and colorable belief that a juror may be prejudiced, he may not unilaterally decide to allow that juror to remain on the panel.

The Appellate Division's holding entailing a "legitimate and colorable belief" on the part of the prosecutor was not made part of the Supreme Court's holding. Compare the "prosecuting attorney has a responsibility to bring to the attention of the presiding judge **any evidence** of partiality or bias" language, Murphy, 110 N.J. at 33, with the "prosecutor is made aware of facts which support a **legitimate and colorable belief**," language, Murphy, 213 N.J.Super. at 506 (emphasis added). The Appellate Division in State v. Brown, 289 N.J.Super. 285, 291 (1996) (Prosecutor's failure to bring issue of Grand Juror potential bias to the Assignment Judge after having a colloquy with a Grand Juror in the hallway (with the reporter present) mandated dismissal of the Indictment under Murphy) held the following concerning a threshold finding by the prosecutor:

> [W]hen a potential for bias or interest arises, the prosecutor may make a threshold finding to determine if the facts as presented by the grand juror

The Supreme Court has had recent occasion to buttress Murphy's bright-line rule. State v. Shaw, 241 N.J. 223, 240 (2020) ("The doctrine [of fundamental fairness] has been invoked . . . to require prosecutors to bring to the court's attention "evidence of partiality or bias" held by grand jurors, Murphy, 110 N.J. at 33").

**POINT TWO**

**THE INDICTMENT MUST BE DISMISSED DUE TO THE ASSISTANT PROSECUTOR'S MISLEADING AND INCORRECT STATEMENTS OF LAW AND THE ABSENCE OF EVIDENCE TO SUSTAIN PROBABLE CAUSE**

A foundational case regarding the dismissal of an Indictment is State v. Hogan, 144 N.J. 216, 229 (1996). The Supreme Court expressed that it had

> greater willingness to review grand jury proceedings where the alleged deficiency in the proceedings affects the grand jurors ability to make an informed decision whether to indict. See Murphy, supra, 110 N.J. at 35 (recognizing general reluctance of courts to dismiss indictments but noting that indictment may be dismissed if alleged misconduct infringes on grand jury's decision-making function).

In the subsequent unrelated Appellate Division decision of State v. Hogan, 336 N.J.Super, 319, 344 (App. Div. 2001), the Appellate Division had occasion to expound on the standard for governing dismissal of an Indictment due to a persecutorial error in

connection with instructions:

> Because an indictment should be dismissed only on the clearest and plainest grounds, the test should be a rigorous one. Only in the exceptional case will a prosecutor's decision pertaining to an instruction on justification constitute grounds for challenging an indictment. The standard can be articulated in a variety of ways, but we suggest that an indictment should not be dismissed unless the prosecutor's error was clearly capable of producing an unjust result. This standard can be satisfied by showing that the grand jury would have reached a different result but for the prosecutor's error.

Following in the wake of the Supreme Court in Hogan (1996) and the Appellate Division in Hogan (2001), the Appellate Division's decision in State v. Triestman, 416 N.J.Super. 195, 205 (App. Div. 2010) approached the facts of our case more directly:

> Incomplete or imprecise grand-jury instructions do not necessarily warrant dismissal of an indictment; rather, the instructions must be "blatantly wrong." [Citations omitted]. In short, an indictment will fail where a prosecutor's instructions to the grand jury were misleading or an incorrect statement of law.

Notwithstanding this on-its-face high bar for a defendant to overcome on a motion to dismiss based on "a prosecutor's instructions to the grand jury [that] were misleading or an incorrect statement of law[,]" the Court made short work of agreeing with defendant that the Indictment could not stand based on a granular analysis of the prosecutor's charge.

In Triestman, the Court summed up the prosecutor's errors as follows:

> First, the prosecutor in the above-quoted passage should have referenced "Section 2C:14-2c(1) through (4)", not Section 2C:14-2c through (4)." Second, the prosecutor never indicated that she was charging the jury on N.J.S.A. 2C:14-2c at all; she merely informed the jury that she was charging them on "sexual assault." Thus, although the jury knew it had been charged on offenses under N.J.S.A. 2C:14-2, it had no idea which portion of that charge contained the circumstances that would establish criminal sexual contact under N.J.S.A. 2C:14-3.

Id. at 206-207.

This granular analysis led the Court to conclude that the Grand Jury had been misled.

More than that,

> [t]he misleading effect of this charge was compounded by the passage of more than two months before the prosecutor presented this case. In the interim, the grand jury had considered a variety of sexual and other crimes. The average grand juror could not possibly be expected to recall and apply the elements of any crime, including criminal sexual contact, after such a hiatus. At the very least, the prosecutor on December 12, 2008, should have provided the jury with a written charge on the elements of criminal sexual contact, including relevant definitions and the pertinent portions of N.J.S.A. 2C:14-2c. As a result, the instructions given were so misleading that the indictment cannot stand.

Id. at 207.

The flaws the Appellate Division found existed in Triestman echo, and in some instances are on all fours with those existing in our case.

In the presentment to the Grand Jury, the Assistant Prosecutor misled it by:

1) Significantly, the Assistant Prosecutor's charge on the law on bias intimidation directly following his charge on the law on defense of others without any cautionary instruction as to the limitation of use of the bias intimidation charge to Mr. Silberberg only, had a strong tendency to cause confusion of the Grand Jurors. See Excerpt 5 from the Grand Jury transcripts set forth above under the Facts section of this Letter Brief. The essence of that excerpt:

> Finally, you must determine whether Glick acted reasonably. I'm sorry. You must determine whether Glick reasonably believed that these actions were necessary to protect Silberberg.
>
> That's all the law as to this case. So that's the law as to the justification defense for use of force and protection of others. That's the laws as to self-defense. I read the law previously as to bias intimidation, and you previously had been read the law as to the weapons offenses and aggravated assault.
>
> Given all of that anybody have questions regarding the law. I see one hand. Yeah. Two hands.
>
> JUROR: Can you just read bias intimidation again?
>
> MR. TEISCH: Yes. Under 2C:16-1(a)(1), a person is guilty of the crime of bias intimidation if he commits, attempts to commit, conspires with another to commit, or threatens the immediate commission of an offense specified for purposed of this case in N.J.S.A. 2C:12-1, which is aggravated assault or simple assault, with the purpose to intimidate an individual or group of individuals because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin or ethnicity.
>
> Bias intimidation is a crime one degree higher than the most

> serious underlying crime. So, if the assault in this case were a third-degree, the bias charge would be second-degree.

The Assistant Prosecutor's caution should have been triggered that there was a potential for confusion when right after he had concluded focusing exclusively on Dr. Glick by reading the law (incorrectly as discussed below) on the justification defense for use of force and protection of others, a Grand Juror asks for a reread on the law pertaining to bias intimidation. This caution should have been heightened because the presentment was rife with the elucidation of facts that bore on bias intimidation without any limitation on its use solely to Mr. Silberberg. See Excerpt Nos. 10 through 12. Without any relevancy to the charges against Dr. Glick, the Assistant Prosecutor, when eliciting testimony from his office's detective in connection with the events occurring with and surrounding Dr. Glick, makes multiple references to the fact that the "Pro-Palestinian" protestors are wearing "Kufiya[s]," widely seen as a symbol of Palestinian ethnic identity. This again serves to further confuse the Grand Jury into believing that in fact Bias Intimidation was involved in the case against Dr. Glick.

2) An Assistant Prosecutor had instructed the Grand Jury on the law pertaining to the definition of "Significant Bodily Injury," an essential element of the alleged violation of N.J.S.A. 2C:12-1b(7)(Aggravated Assault) with which Dr. Glick was charged. That instruction on the law was given to the Grand Jury on March 12, 2025, as part of the State's preliminary instructions on the law approximately 3.5 months before the presentment of the case against Dr. Glick on June 25, 2025. Likewise, the essential

"provocation" limitation. He failed to actually read – let alone explain this complex area of the law – N.J.S.A. 2C:3-4b(2)(a). Scouring the Grand Jury transcript fails to reveal any facts deduced that relate in any way to a purpose on Mr. Silberberg's part of "causing death or serious bodily harm" to Mr. Sharif as required by the statute. In fact, what should be dispositive is that Mr. Silberberg was only charged by Complaint with Aggravated Assault under N.J.S.A. 2C:12-1b(7) where the required level of injury to the victim is "Significant Bodily Injury," the Grand Jury proceeding against Mr. Silberberg was wholly based on a violation of that statute with its "Significant Bodily Injury" standard, and, in fact, the Indictment returned against Mr. Silberberg charged a violation of N.J.S.A. 2C:12-1b(7) where the required level of injury to the victim is "Significant Bodily Injury." Compare the identical definitions in N.J.S.A. 2C:3-11d (" 'Serious bodily harm' means bodily harm which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ") with N.J.S.A. 2C:11-1b (" 'Serious bodily injury' means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ"). Instead, what the Grand Jury transcript reveals is the action of Mr. Silberberg, in an extremely volatile situation, pepper spraying Mr. Sharif. Thereafter, even Dr. Glick's strike on Mr. Sharif, in combination with the pepper spraying, still did not result in "Significant Bodily Injury" to Mr. Sharif let alone "Serious Bodily Injury." In addition to what was noted above about Dr. Glick's testimony in connection with his observations of Mr. Sharif after he was struck (Dr. Glick "remember[ed] seeing Mr. Sharif rejoin the protest," "go back to [blowing] his horn," and "initially refuse medical attention"), the

temporary loss of any one of the five senses.

See Excerpt No. 7 above. Was a "temporary loss of the function of any bodily member or organ" an issue? Or was a "temporary loss of any one of the five senses" an issue? More than that, however, the Grand Jury was never presented with any evidence that would sustain a finding of probable cause on either branch of the statutory definition of "Significant bodily injury." The entirety of the testimony in connection with this critical issue was as follows:

> Q. Now Detective . . . [b]ased on your knowledge, and your review of the facts and circumstances of this case, is your understanding that Mr. Shaif did ultimately have to go to the hospital for his injury, correct?
>
> A. Yes.
>
> Q. And that when he went to the hospital he did receive four staples to close the wound to his head?
>
> A. Yes.

See Excerpt No. 9 above. Mr. Sharif having to go to the hospital and receiving four staples to close the wound to his head does not provide any factual basis, let alone one supporting probable cause, that Mr. Sharif experienced a "temporary loss of the function of any bodily member or organ" or a "temporary loss of any one of the five senses." In fact, Dr. Glick's uncontradicted testimony before the Grand Jury was that "Mr. Sharif himself didn't know that he was hit in the head until much later on" and Dr. Glick

protection of others. State v. Holmes, 208 N.J.Super. 480 (App. Div. 1986) had occasion to sharpen the law regarding this overlap. At issue in Holmes was the "provocation" limitation embodied in N.J.S.A. 2C:3-4b(2)(a):

> The actor, **with the purpose of causing death or serious bodily harm**, provoked the use of force against himself in the same encounter.

[Emphasis Added]. While agreeing with the State that N.J.S.A. 2C:3-5a (1), the statute governing use of force for the protection of others, incorporates the "provocation" limitation thereby precluding reliance on same if the defendant were the aggressor, id. at 485, Holmes read the statute as providing

> A justification for protection of a third person when the actor: (1) reasonably believes that force is necessary to protect the other; (2) reasonably believes that his intervention is necessary for that protection, and (3) uses only that degree of force appropriate to protect the person he believes to be threatened.

Id. at 485-486. Holmes held that the "provocation" limitation "must be understood in light of the "reasonableness" component relating to the actor's belief that the third person was threatened, that intervention was necessary and that the force used was justified," Id. at 486-487, thus not precluding the justification for the defense of others where the defendant is "unaware of the 'provocation' caused by the person he endeavors to protect." Id. at 486.

The Assistant Prosecutor fatally erred in his instructions to the Grand Jury regarding the

"remember[ed] seeing Mr. Sharif rejoin the protest," "go back to [blowing] his horn," and "initially refuse medical attention." See Excerpts 13 and 14. Cf. State v. Gomez, 430 N.J.Super. 175, 180, 189 (App. Div. 2013) (Proof of level of impairment of the functioning of the victim's eye critical in a prosecution involving an assault).

3) As is evident from the Grand Jury transcript, the Assistant Prosecutor focused on conveying to the Grand Jury that Dr. Glick had witnessed Mr. Silberberg's use of pepper spray on Mr. Sharif thereby from the Assistant Prosecutor's perspective disqualifying Dr. Glick from the ability to use force in the protection of Mr. Silberberg. See Excerpt No. 3 (for the multiple questions pertaining to this same point to which Dr. Glick had given the same answers) and See Excerpt No. 4 (after Dr. Glick had read his prepared statement and Dr. Glick's time before the Grand Jury was coming to a conclusion, the Assistant Prosecutor, seeking to leave what he thought was the key point in the Grand Jury's consciousness, yet again asked the question and yet again Dr. Glick gave the same answer and pointed out that he had answered the same question multiple times). The law's requirement for bringing the "provocation" limitation into play was not conveyed to the Grand Jury. This "blatantly wrong" instruction, Triestman, supra. 416 N.J.Super. at 205 ("An indictment will fail where a prosecutor's instructions to the grand jury were misleading or an incorrect statement of law") should result in the dismissal of the Indictment.

It is uncontested that under New Jersey law there is an overlap between self-defense and

elements of the alleged violation of N.J.S.A. 2C:12-1b(7)(Aggravated Assault) itself were last given to the Grand Jury on March 12, 2025, again approximately 3.5 months before the presentment. See Except No. 6 from the Grand Jury transcripts set forth above under the Facts section of this Letter Brief. See also the transcript of the June 25, 2025, Grand Jury presentment, Page 93, Lines 11-12 ([Y]ou previously have been read the law as to the weapons offenses and aggravated assault").

The Appellate Division in Triestman saw fit to dismiss the Indictment where there was only a passage of two months from the date of the preliminary instructions on the law pertaining to criminal sexual contact ("The misleading effect of this [preliminary] charge was compounded by the passage of more than two months before the prosecutor presented this case," id.). The compounding effect of the passage of time in the instant case occurred not from omission of the proper range of the subsection as in Triestman, (Section 2C:14-2c(1) through (4) as opposed to the erroneously charged Section 2C:14-2c through (4)). But, akin to the lack of awareness on the part of the Grand Jury in Triestman as to the proper subsection of the relevant statute at issue ("although the jury knew it had been charged on offenses under N.J.S.A 2C:14-2, it has no idea which portion of that charge contained the circumstances that would establish criminal sexual contact under N.J.S.A. 2C:14-3"), the instant Grand Jury has "no idea" which part of the definition of Significant Bodily Injury was at issue:

> [Significant bodily injury] means bodily injury in which – which creates a temporary loss of the function of any bodily member or organ or

against Dr. Glick. The Indictment should be dismissed.

## CONCLUSION

In sum:

1) The Assistant Prosecutor did not submit the Issue of the Grand Juror's potential bias to the Assignment Judge for decision when required to do so thus violating the Murphy bright-line procedure and R. 3:6-3(a) with the consequence that the Indictment must be dismissed *in toto*.

2) The Assistant Prosecutor's charge on the law on bias intimidation directly following his charge on the law on defense of others, without any cautionary instruction as to the limitation of the use of the bias intimidation charge to Mr. Silberberg only, had a strong tendency to cause the Grand Jurors to apply bias intimidation to its evaluation of the evidence against Dr. Glick. Likewise, the Assistant Prosecutor's multiple references to the "Pro-Palestinian" protestors wearing "Kufiya[s]" when introducing evidence about Dr. Glick's conduct also had a strong tendency to cause the Grand Jurors to apply bias intimidation to its evaluation of the evidence against Dr. Glick. These mutually reinforcing errors misled the Grand Jury resulting in an Indictment being wrongfully returned against Dr. Glick.

3) The Grand Jury had "no idea" which part of the definition of "Significant

Bodily Injury" was at issue, and the Assistant Prosecutor failed to elicit any facts supporting probable cause that Mr. Sharif sustained same either by experiencing a "temporary loss of the function of any bodily member or organ" or a "temporary loss of any one of the five senses." This major error was compounded by the many months that elapsed from the preliminary instructions on the law – including the definitions of "Aggravated Assault" and its constituent "Significant Bodily Injury" requirement - to the presentment where the Grand Jury was called upon to evaluate the facts in light of law that it very likely no longer retained. This error resulted in an Indictment being wrongfully returned against Dr. Glick.

4) Given the absence of any evidence of Mr. Silberberg's "purpose of causing death or serious bodily harm," the "provocation" limitation, which was the lynchpin of the Assistant Prosecutor's challenge to Dr. Glick's legal right to use force in protection of Mr. Silberberg, was inapplicable. This error resulted in an Indictment being wrongfully returned against Dr. Glick.

For the foregoing reasons, it is respectfully submitted that Indictment No. 25-07-01562-I should be

dismissed.

Respectfully submitted,